**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **REGIONAL SCHOOL DISTRICT NO. 9** | : | |
| **BOARD OF EDUCATION,** | : | |
| | : | |
| **v.** | : | **NO. 3:07-CV-01484 (WWE)** |
| | : | |
| **MR. and MRS. M., as Parents and Next** | : | |
| **Friends of M.M. a Minor Child,** | : | |
| | : | |
| | : | |

**MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Regional School District No. 9 Board of Education ("District No. 9") has

filed a complaint appealing the administrative decision finding in favor of defendants Mr.

and Mrs. M. on behalf of their minor child M.M. pursuant to the Individuals with

Disabilities Act ("IDEA"), 20 U.S.C. § 1415.[1]

The parties have filed cross motions for summary judgment.  For the following

reasons, plaintiff's motion for summary judgment will be denied and defendants' motion

for summary judgment will be granted.

**Factual Background**

The parties have submitted statements of undisputed facts with supporting

exhibits, which reveal the following factual background.

Mr. and Mrs. M. ("defendant Parents") and M.M. are residents of Redding,

Connecticut.  Defendant M.M. was born on November 13, 1989.

---

[1] In 2004, Congress reauthorized IDEA as the Individuals with Disabilities
Education Improvement Act ("IDEIA").  See Pub.L. No. 108-446, 118 Stat. 2647 (Dec.
3, 2004).  However, this ruling, consistent with most recent case law, refers to the
statute as IDEA.

1

In ninth and tenth grades, M.M. attended Dana Hall, a private boarding school in Wellesley, Massachusetts.  In October 2005, M.M. took a medical leave from Dana Hall after the school psychologist informed defendant Parents that he believed that M.M. was bulimic and suicidal.

On November 7, 2005, defendant Parents placed M.M. at Four Winds Hospital in Katonah, New York, where she remained until just before Christmas.  Dana Hall sent M.M. her homework.  Although M.M. had spent two months of the second trimester at Four Winds, she received passing grades in all of her subjects.[2]

M.M. returned to Dana Hall in January 2006.  However, Dana Hall asked her to leave the school three weeks before the conclusion of the 2005-2006 school year because the school believed that she had been involved in the theft of some soft drinks.

Consequently, in May 2006, M.M.'s mother contacted Anne Kipp, the head of the Guidance Department at Joel Barlow High School, to request that it administer M.M.'s final exams from Dana Hall.  M.M.'s mother told Kipp that M.M. had been feeling stress at Dana Hall and that M.M. was interested in attending a co-educational school.  Kipp agreed to allow M.M. take her Dana Hall finals in a proctored environment at Joel Barlow.  Dana Hall sent the examinations to Joel Barlow.  After M.M. completed her exams, Joel Barlow forwarded them to Dana Hall for grading.  M.M. received her final grades for the 2005-2006 school year from Dana Hall.

---

[2]She received the following grades: Literature and Composition II – A-; French III – B; Geometry – C; East Asian Studies – B; Chorus – B+.

On June 16, 2006, M.M. and her mother met with Kipp and registered M.M. for the 2006-2007 school year at Joel Barlow.[3]  M.M's mother informed Kipp that M.M. would be leaving on June 28, 2006 to study at La Sorbonne in Paris.

M.M. completed the summer work required for participation in Advanced Placement English.  Her work was reviewed by Janice Garvey, an English teacher at Joel Barlow.  Garvey reported to Kipp that M.M. "was doing beautifully."

During the night of August 13, 2007, M.M. took sleeping pills and was taken to Danbury Hospital.  On August 14, she was transferred to Silver Hill Hospital, a psychiatric hospital in New Canaan, Connecticut.  M.M.'s father indicated that there were no substantial warnings prior to this incident.

M.M. was diagnosed by Dr. Rocco Marotta, her treating psychiatrist, as having severe depression.

On August 17, 2007, M.M.'s mother submitted a State of Connecticut Department of Education Health Assessment Record to the school nurse at Joel Barlow High School.  Any new student coming into a high school is required by state law to have a physical and submit the Health Assessment Record.  M.M.'s mother indicated on the form that she had concerns about her child's general health, that M.M. had been diagnosed with a chronic disease, that M.M. took medications, and that she would like to discuss her child's health with the school nurse.  She wrote:

---

[3]Pursuant to Connecticut General Statutes § 10-259, the "fiscal and school year shall commence July first and end June thirtieth."  The calendar for Joel Barlow indicates that the first day of classes for the 2006-2007 school year was August 31, 2006.

> During the Fall of 2005, [M.M.] was diagnosed with bulimia and depression for which she was placed on medical leave. She entered Four Winds Hospital where she was given Prozac [and] became worse under treatment. With assistance from an independent psychiatrist, we were able to get her medication changed to Wellbutrin. This caused her to be unable to sleep. She was given Remeron for this and was readmitted to school in January. Due to side effects from Wellbutrin [and] Remeron, she is now taking Effexor. The bulimia is no longer a problem. She suffers from migraine headaches for which she takes Zomeg. Due to side effects, we are currently re-evaluating using Effexor to treat the depression.

According to her testimony at the administrative hearing, M.M.'s mother did not include information about M.M.'s suicide attempt because there was not enough room on the form.[4]

The second page of the Health Assessment Record was completed by M.M.'s primary care physician on August 7, 2006. In response to the entry on the form as to "problems which may adversely affect [the student's] educational experience," the doctor did not check the boxes next to "Emotional/Social" or "Behavior." She did indicate M.M. was on the long-term medication of Effexor, that M.M. could participate fully in the school program, and that M.M. had maintained her level of wellness.

On August 22, 2006, M.M.'s mother informed Kipp that M.M. had been admitted to Silver Hill. She indicated that M.M. would not be present on the first day, although she did not mention to Kipp that M.M. had attempted suicide.

On August 25, 2006, defendant Parents placed M.M. at a program called Youth Care in Draper, Utah, an intensive therapeutic educational program which enables suicidal adolescents to go to school and receive acute care in a safe environment.

---

[4]At the administrative hearing, Anne Marie Gorman, the school nurse, stated that she did not consider it unusual that M.M. was on antidepressants.

4

In late August 2006, close to the commencement of classes at Joel Barlow, M.M.'s mother informed Kipp that M.M. had been placed at Youth Care for "suicide intervention."  Kipp then conveyed this information to Cherie Schutt, a teacher in Joel Barlow's Special Services Department.

On September 11, 2006, Dr. Robin Weiner, a psychologist in Draper, Utah, administered a psychological evaluation of M.M.

On September 18, 2006, M.M. had not yet appeared at Joel Barlow. Accordingly, Maryann Pieratti, a social worker at the high school, called M.M.'s parents. Pierratti discussed special education and requested that the parents forward Youth Care's treatment plan.  During this conversation, Pierratti asked M.M.'s mother whether she should schedule a Planning and Placement Team ("PPT") meeting for M.M.  The mother responded that she did not know what to ask for.

On September 21, 2006, Youth Care drafted a treatment plan for M.M.

On October 3, 2006, M.M.'s parents received a mid-quarter progress report from Joel Barlow.  Curiously, although M.M. had not attended any classes at Joel Barlow, the report noted that she was making good progress in Algebra and was a pleasure to have in class.

In a letter dated October 17, 2006, Jonathan Budd, Coordinator of Academic Services, wrote to M.M.'s parents informing them that the Connecticut Academic Performance Test would be given in March 2007.

On November 4, 2006, M.M's parents removed M.M. from Youth Care in Utah and placed her at John Dewey Academy in Great Barrington, Massachusetts, a therapeutic boarding school that defendant Parents liked for its academic program.

5

On December 7, 2006, Susan Haig, special education teacher at Joel Barlow, sent defendant Parents a letter advising them of the policy on truancy.  She also provided them with the second mid-quarter progress report, which indicated that M.M. was making satisfactory progress and had actively participated in her United States history class, although M.M. had yet to attend Joel Barlow.

On December 23, 2006, M.M. left John Dewey, and on December 24, 2006, was admitted to Berkshire Medical Center in Pittsfield, Massachusetts, for evaluation.

On January 4, 2007, M.M.'s parents placed her at Second Nature, a wilderness program located in Duchesne, Utah.

In a letter dated January 5, 2007, defendants' attorney wrote to Patty Roszko, Special Education Supervisor for Regional No. 9, to request a PPT meeting for M.M. The letter indicated that M.M. was enrolled at Second Nature, and that the letter provided "notice of intent to place" M.M. at this therapeutic school.   The letter was accompanied by the September 11, 2006 psychological evaluation from Dr. Weiner.

On January 11, 2007, defendants' attorney sent Roszko M.M.'s transcript from Dana Hall for the 2004-2005 and 2005-2006 school years.  On January 22, 2007, defendants' attorney wrote to Roszko:

> I wrote you on January 5, 2007 and requested the scheduling of a PPT meeting in order to discuss my client's need for special education and related services.  I have not received any response to that letter to date.

On January 31, 2007, District No. 9 mailed a PPT notice to defendant Parents for a PPT meeting on February 8, 2007.  A PPT meeting was convened on February 8, 2007.

At that meeting, defendants' attorney asserted that the PPT could and should accept Dr. Weiner's evaluation as a basis for identifying M.M. as eligible for special education.  Dr. Marotta participated in the PPT meeting by telephone.[5]  Dr. Marotta also expressed his opinion that M.M. met the criteria for special education under the emotional disturbance category and that she required a structured, therapeutic boarding school environment in order to be educated.  Dr. Marotta opined further that Dr. Weiner's report was "suggestive" of a non-verbal disability, and he indicated that there might be other tests that "one might want to give to her...."

Dale Barcham, a school psychologist at Joel Barlow, also attended the PPT. The Joel Barlow staff believed that additional evaluations were necessary, including an observation, a cross battery assessment, and a clinical interview.  The Joel Barlow staff wanted to conduct these evaluations, and they recommended that M.M. could be evaluated when she returned to Connecticut.

M.M.'s parents reported that M.M. was not sufficiently stable to return to Connecticut.  Dr. Marotta also opined that M.M. could not be safely transported back to Connecticut at the time she was enrolled in Second Nature.  The defendant Parents offered to pay for District No. 9 staff to complete an evaluation and do an observation in Utah.  However, District No. 9 refused this offer.

In a letter dated February 23, 2007 to District No. 9's attorney, defendants'

---

[5]Dr. Marotta had not seen M.M. since her August 25, 2006 placement at Youth Care, although he had spoken to her twice by telephone prior to January 4, 2007.

attorney conveyed defendant Parents' post-PPT position as follows:

> My clients' requested that [M.M.] be found eligible by the PPT under the
> E.D. category that Region 9 reimburse the costs of Second Nature, and
> that Region 9 reimburse the costs of VISTA or similar therapeutic program
> upon discharge from Second Nature.  Those requests were refused by the
> PPT.
>
> ***
>
> I believe that the last sentence in the PPT minutes is incomplete and
> should contain the word "eligibility".  Since the Parents either met with
> school officials or spoke to them during June, August, and September,
> plus the information in the School Health Form and JBHS attendance
> reports, the Parents believe that Region No. 9 had violated the Child Find
> provisions by not referring M.M. to a PPT prior to February 8, 2007.

At the PPT meeting, Region No. 9 obtained defendant Parents' authorization to

obtain information from the private schools that M.M. had attended from fourth through

tenth grades.

On March 13, 2007, M.M.'s parents placed her at Vista at Dimple Dell Canyon in

Sandy, Utah.

On March 26, 2007, M.M.'s father sent a letter to Haig, enclosing the signed

evaluation consent form.  He stated:

> We had disputed Regional No. 9's claim that additional evaluations were
> necessary, given the information provided to the PPT by us and Dr.
> Marotta, as well as Dr. Weiner's evaluation report.  After the PPT meeting,
> our attorney had informed Region No. 9's attorney of our offer to pay the
> reasonable travel expenses of Region No. 9 personnel to evaluate our
> daughter in Utah.  We were disappointed to learn that Region No. 9 had
> refused our offer.

On April 23, 2007, defendant Parents' attorney provided District No. 9 with the

Master Treatment Plan for M.M. that was developed by VISTA following M.M.'s

transition from Second Nature.  In his cover letter, he wrote:

8

If you recall, the Parents had advised the PPT that [M.M.] would transition from Second Nature and that transfer has occurred.  My clients had provided Notice of their intent to place [M.M.] at VISTA during the last PPT and they had requested reimbursement for that placement, as well as Second Nature both during and prior to the February 8, 2007 PPT.

I would appreciate it if you would share the enclosed Treatment Plan with your clients.  Please contact me if Region 9 requires a PPT meeting in order to formally consider the information in the Master Treatment Plan as part of the Parents' referral to special education and request for a determination of eligibility under the E.D. category, as well as the program and placement as set forth during the February 8, 2007 PPT.

As of May 10, 2007, M.M. had not been evaluated.  The Parents' attorney requested a due process hearing from the State Department of Education.  Hearings were held on May 21, June 11, 14, 19, 21 and July 3, 2007.  Following the close of evidence, the parties filed post-hearing briefs.

In its reply brief dated August 17, 2007, District No. 9 maintained that the action should be dismissed for lack of subject matter jurisdiction.  On August 21, 2007, District No. 9 submitted a Motion to Dismiss for lack of subject matter jurisdiction.

On August 23, 2007, the State Department of Education issued a Final Decision in the matter finding in favor of the Parents.  The hearing officer found that District No. 9 failed to satisfy its Child Find obligations, that the February 8, 2007 PPT had sufficient information to determine her eligibility for special education under the emotional disturbance category, and that District No. 9 failed to offer M.M. a Free Appropriate Public Education ("FAPE").[6]  She held that defendants were entitled to reimbursement

---

[6]Pursuant to IDEA, a public education agency must satisfy its Child Find obligation to ensure that all children with disabilities "residing within the State" are identified, located and evaluated as to whether special education services are necessary.  See 20 U.S.C. § 1412(a)(3)(A) and discussion on page 14 of this ruling.

for the costs of Second Nature and Vista at Dimple Dell programs from the date that

they had provided notice of intent to place M.M.   In concluding that the Board had

failed its Child Find obligation, which was triggered as of August 22, 2006, the hearing

officer reasoned:

> As of the August 22, 2006 the Board staff had had at least three
> conversations about the Student with the mother, had received the health
> assessment form from the mother and had had the student in one of their
> classes.  As of this date they knew that this Student had been hospitalized
> eight months earlier for an emotional problem, had missed weeks of
> school as a result, suffered a drop in grades as a result, was now in a
> psychiatric hospital again and would not start on the first day of school.
> Ms. Haig is absolutely correct that the fact that a student was hospitalized
> does not, in and of itself, entitle them to special education services.
> However the issue here is not whether the Board should have known on
> August 22, 2006 whether the Student qualified for special education
> services but rather only whether the Board should have convened a PPT
> to begin to evaluate that possibility.  Child Find requires the Board locate
> identify and evaluate students who are *suspected of* being a child with a
> disability even though they are advancing from grade to grade.... The fact
> that there was other information that may have ultimately established that
> the Student did not qualify for special education does not alter the fact
> that the Board had an obligation to evaluate this Student because there
> was ample evidence as of August 22, 2006 and probably before that
> should have given this Board reason to suspect that the Student might
> have a disability and that is all the law requires for the Board to conduct
> an evaluation.

She noted that the Board had failed to comply with IDEA's procedural safeguards:

> Board witness after Board witness testified to the effect that the Student was not
> their responsibility and not one of them at any time prior to the PPT correctly
> informed the Parents of their procedural safeguards; alternatively, if they actually
> believed that Utah was the correct place to pursue evaluation and identification
> they never shared this information with the Parents.  The IDEA has a detailed
> regulatory scheme to help ensure parent participation in the IEP process and
> IDEA anticipates that the parties will collaborate with each other and certainly
> good faith in that regard is implied.  If the Board actually believed that Utah was
> the correct place to pursue evaluation and identification they had an obligation to
> tell the Parents and they are not relieved of this obligation by the fact that a
> parent hires representation.

In a brief address to the Board's argument against subject matter jurisdiction,

she wrote:

> The Board did not discharge its Child Find obligations consistent with the IDEA when it failed to locate, identify or refer the Student to a PPT beginning at least on August 22, 2006. To date, the Board has failed to implement the hearing officer's decision. As of August 22, 2006 the Board was the responsible school district in that the Student was both a resident in a Region 9 town and was a Student in the Region 9 high school....The Board is the responsible school district for the Student and it should have convened a PPT in order to evaluate the Student for special education and related services since FAPE is at issue.

She concluded that M.M. had sustained a loss of educational opportunity and

her parents had been deprived of a "meaningful opportunity" to participate in the

development of her IEP due to the "absence of the Board making a timely referral to the

PPT following the August 22, 2006 conversation between the school guidance

counselor and Mother, coupled with its failure to determine whether the Student was

eligible for special education during the February 8, 2007 PPT meeting, and its failure

to arrange or complete any evaluation after the Parents' March 26, 2007 consent

form...."  The hearing officer held that District No. 9  "is responsible for costs of the

Second Nature and Vista at Dimple Dell programs from the date the Board had

received notice of the student's placement", and that the defendant Parents were

entitled to an award of compensatory education and ordered reimbursement of

"reasonable educational and therapeutic expenditures incurred after August 22, 2006

through the date of the Second Nature placement."

District No. 9 has appealed this decision.

**Discussion**

A motion for summary judgment must be granted if the pleadings, discovery

materials before the court and any affidavits show that there is no genuine issue as to

any material fact and it is clear that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a

reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden is on the moving party to

demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l

Group, Inc. v. London Am. Int'l Corp., 664 F. 2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential

element of his case with respect to which he has the burden of proof, then summary

judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party

submits evidence which is "merely colorable," legally sufficient opposition to the motion

for summary judgment is not met.  Liberty Lobby, 477 U.S. at 24.  The mere existence

of a scintilla of evidence in support of the nonmoving party's position is insufficient;

there must be evidence on which the jury could reasonably find for him. See Dawson v.

County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all

permissible factual inferences in favor of the nonmoving party.  See Patterson v.

County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the

record from which a reasonable inference could be drawn in favor of the opposing party

on the issue on which summary judgment is sought, summary judgment is improper.

12

See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

Summary judgement is a pragmatic procedural mechanism in the federal rules for resolving IDEA actions.  Lillibask v. Connecticut Dept. of Educ., 397 F.3d 77, 84 (2d Cir. 2005).  The Court's inquiry is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed.  A.E. v. Westport Bd. of Educ., 463 F. Supp. 2d 208, 215 (D. Conn. 2006)

Under IDEA, when a federal court reviews the findings and conclusions reached in a state administrative proceeding, it must base its decision on the preponderance of the evidence, after reviewing the administrative record and any additional evidence presented. Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122-123 (2d Cir. 1998).  This is not an invitation to the courts to substitute "their own notions of sound educational policy for those of the school authorities which they review."  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982).  Federal courts do not "rubber stamp" administrative decisions but must accord "due weight" to these proceedings.  Walczak, 142 F.3d at 129.

In Cerra v. Pawling Cent. School Dist., 427 F.3d 186, 191 (2d Cir. 2005), the Second Circuit emphasized that district courts should pay deference to administrative judgments on matters of educational policy.  Deference is particularly appropriate where the state hearing officer's review has been thorough and careful."  Walczak, 142 F. 3d at 122.

However, in matters of statutory interpretation or mixed issues of law and fact, the district court is not bound by a rule of deference but may apply a de novo standard of review.  Muller v. Committee on Special Educ. of East Islip Union Free Sch. Dist., 145 F.3d 95, 102 (2d Cir. 1998).

IDEA

IDEA provides federal grants to states so that they may in turn provide disabled children with "a free appropriate public education" in the least restrictive, appropriate environment.  See 20 U.S.C. §§ 1400(d)(1)(A), 1401(8), 1411(a)(1) & 1412(a)(5)(A).  All public education agencies are required to satisfy their "Child Find" obligation through policies and procedures that ensure that:

> All children with disabilities residing in the State, including children who are homeless or wards of the state and children with disabilities attending private schools, regardless of the severity of their disability, and who are in need of special education and related services, are identified, located and evaluated and a practical method is developed and implemented to determine which children are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A).  The Child Find duty extends to all children suspected of having a disability.  34 C.F.R. § 300.111(c)(1).  The duty is triggered when the local education agency ("LEA") has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability.  New Paltz Central Sch. Dist. v. St. Pierre, 307 F. Supp. 2d 394, 400 (N.D.N.Y. 2004).

When a child is identified as potentially requiring special education services, the LEA has a duty to complete the evaluation process and failure to complete the process constitutes a denial of a FAPE.  20 U.S.C. § 1414(b)(2)(A)(i); see N.G. v. Dist. of Columbia, 556 F. Supp. 2d 11, 16 (D. D.C. 2008).  The LEA must evaluate the student

14

within a reasonable time after notice or suspicion of a disability.  30 C.F.R. §

300.301(c)(1); El Paso Indep. Sch. Dist. v. Richard R., 567 F. Supp. 2d 918, 950 (W.D.

Tex. 2008).

To conduct the evaluation, the LEA "shall use a variety of assessment tools and

strategies to gather relevant functional, developmental, and academic information,

including information provided by the parent, that may assist in determining" whether

the child is disabled under the Act.  20 U.S.C. § 1414(b)(2)(A)(i).   Section

1412(a)(10)(iii) directs the LEA to ensure a "timely and meaningful consultation" with

the private school representatives and parents of a student with disabilities placed at a

private school during the design and development of special education services.

Once the student is determined to be eligible, the student's educators and

parents meet and jointly develop an individualized education program ("IEP") for each

year of the child's education.  See 20 U.S.C. §§ 1401(11), 1414(d); Polera v. Bd. of

Educ. of the Newburgh Enlarged Stamford Sch. Dist., 288 F.3d 478, 482 (2d Cir. 2002);

see also P.J. v. Conn. Bd. of Educ., 788 F. Supp. 673, 676 n.1 (D. Conn. 1992) ("The

IEP is produced by what is known as the planning and placement team, which must

include a qualified special education representative of the school board, the child's

teacher, and one or more of the child's parents, and may also include individuals who

evaluate the child or provide special education services to the child.").

Connecticut Agencies Regulations § 10-76d-13(a)(1) provides that the IEP shall

be implemented within forty-five days of the referral or notice of a child who may require

special education.  At a minimum, the IEP must provide personalized instruction with

sufficient support services to permit the child to benefit educationally.  Rowley, 458 U.S.

15

at 203.  It is through the IEP that the school may monitor the student and her progress.
Polera, 288 F.3d at 482.

IDEA provides for procedural safeguards through which a parent can ensure her child's education.  20 U.S.C. § 1415(a).  These procedural safeguards include the rights "to examine all records relating to [the] child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child and to obtain an independent educational evaluation of the child," 20 U.S.C. § 1415(b)(1), written notice prior to any changes in the child's identification, evaluation or educational placement, 20 U.S.C. § 1415(b)(3), "an opportunity to present complaints with respect to" such matters, 20 U.S.C.  § 1415(b)(6), and, whenever any such complaint is made, the right to "an impartial due process hearing ... by the State educational agency or by the local educational agency," with corresponding rights to be accompanied and advised by counsel, to present evidence and cross-examine witnesses, to receive a written record of proceedings, and to receive written findings of fact and decisions.  20 U.S.C. § 1415(f)(1) & (h).

The Supreme Court has stated that "adequate compliance with the procedures prescribed in IDEA would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  Rowley, 458 U.S. at 206.  Thus, the Court's procedural inquiry is "no mere formality."  Walczak, 142 F.3d at 122.  However, procedural defects do not constitute denial of a FAPE unless they result in the loss of educational opportunity.  Adam J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 811-12 (5th Cir. 2003).

16

Parents who object to their child's identification, evaluation or educational placement are entitled to an impartial due process hearing. 20 U.S.C. § 1415(f). Parties aggrieved by a hearing officer's decision at the due process hearing may bring a civil action. 20 U.S.C. § 1415(i)(2). Pursuant to Connecticut law, at the due process hearing, the LEA bears the burden of proof, although the parents bear the burden of production.[7] Conn. Agencies Regs. § 10-76h-14(a); see also Brennan v. Regional Sch. Dist. No. 1 Bd. of Educ., 531 F. Supp. 2d 245, 263-64 (D. Conn. 2008).

Upon review of an administrative decision, a district court retains authority to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Such relief includes the power to order reimbursement to parents for their expenditures on private education for their child if (1) the school district failed to provide a FAPE and (2) the private education services were appropriate for the child's needs. Forest Grove Sch. Dist. v. T.A., 129 S.Ct. 2484, 2488 (2009). A request for reimbursement of a private placement after a denial of a FAPE "may be reduced or denied" if prior to the parents' removal of the child from the public school, the parents failed to give proper notice of intent to remove the student from public school or did not make the child available for the evaluation requested by the LEA. 20 U.S.C. § 1412(a)(10)(C)(iii); 34

_____

[7]In Schaffer v. Weast, the Supreme Court held that the party seeking relief at the due process hearing bears the burden of proof as to appropriateness of the IEP or the denial of a FAPE. 546 U.S. 49, 61 (2005). To date, it remains unclear whether Schaffer overrides the allocation of burdens specifically set forth by the Connecticut Agencies Regulations, which place the burden of proof upon the relevant school board. See Conn. Agencies Regs. § 10-76h-14(a). However, as pointed out in Brennan, "IDEA's model of cooperative federalism" indicates that states have the ability to allocate the burden of proof for themselves. See Schaffer, 546 U.S. at 67-71, 126 S.Ct. 528 (Breyer, J., dissenting).

C.F.R. § 300.148(d)(1).   The statute provides exceptions to denial or reduction based

on the parents' failure to give proper notice of removal from public school where

compliance with the notice requirement would result in physical or serious emotional

harm to the child.   20 U.S.C. § 1412(a)(10)(C)(iv); 34 C.F.R. § 300.148(e).

Subject Matter Jurisdiction

District No. 9 argues that the hearing officer lacked subject matter jurisdiction at

the administrative level because M.M., as of August 25, 2006 and prior to the

commencement of classes at Joel Barlow, attended the Youth Care program in Utah.

Specifically, District No. 9 contends that the duties imposed by IDEA are retained only

by the LEA in the district of the private school attended by the student.   The hearing

officer rejected this argument without extensive legal analysis.

The lack of subject matter jurisdiction may be raised at any time in the judicial

process.   Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 740 (1976).   If and when a court

observes that it is without subject matter jurisdiction, it must dismiss the action.   See

Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 250 (2d Cir. 2008).

"Generally, litigants cannot waive subject matter jurisdiction by express consent,

conduct, or estoppel."   Doe v. West Hartford Bd. of Educ., 2000 U.S. Dist. LEXIS 6521,

*5 (D. Conn. Mar. 3, 2000) (citing 13 Charles Alan Wright, Arthur R. Miller & Edward H.

Cooper, Federal Practice and Procedure § 3522 at 66-67).

Upon review of the relevant legal authorities, this Court finds that subject matter

jurisdiction is proper.   Section 1412(a)(10)(A)(i) provides:

> To the extent consistent with the number and location of children with
> disabilities in the State who are enrolled by their parents in private
> elementary schools and secondary schools in the school district served by

a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part.

34 C.F.R. § 300.131(f) addresses out-of-state children placed at private schools:

Each LEA in which private, including religious, elementary schools and secondary schools are located must, in carrying out the child find requirements in this section, include parentally-placed private school children who reside in a State other than the State in which the private schools that they attend are located.

In Dist. of Columbia v. Abramson, 493 F. Supp. 2d 80, 84 (D. D.C. 2007), the District Court for the District of Columbia considered and rejected an analogous argument regarding the obligation of the LEA where the student resides to make an eligibility determination after a student has been placed in an out-of-state school. Abramson noted that the LEA of residence is charged with the mandate to make a FAPE available to every resident child.  See 34 C.F.R. § 300.101(a) ("A free appropriate public education must be available to all children residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school") and 34 C.F.R. § 300.201 ("The LEA, in providing for the education of children with disabilities within its jurisdiction, must have in effect policies, procedures, and programs that are consistent with the State policies and procedures established under §§ 300.101 through 300.163").   Thus, the district court reasoned that the LEA where the student resides was not relieved of its IDEA obligations by the fact that the LEA where the student attended school "may have child find responsibilities of its own."  Abramson, 493 F. Supp. 2d at 86.

This is not a case where District No. 9 had no notice that M.M. was a potential student who required special education prior to her departure for Utah.  Here, as the

19

hearing officer found, District No. 9's Child Find duty had been triggered prior to M.M.'s placement at Youth Care in Utah when M.M.'s mother communicated to Joel Barlow staff that M.M. would not be commencing school on time due to her admission to a psychiatric hospital, Silver Hill.  This information should have alerted the staff that M.M. was a child who should be suspected of needing special education and who required evaluation.  Thus, M.M.'s placement in Utah does not divest District No. 9 of its IDEA obligations to a student who remained officially registered at Joel Barlow and a resident of Connecticut.   Accordingly, upon de novo review, the Court will affirm the hearing officer's finding of subject matter jurisdiction.

       Review of Hearing Officer's Decision

       Generally, a court reviewing a hearing officer's decision relevant to the IDEA should consider whether the school board complied with the procedures set forth in the IDEA; and then determine whether the IEP developed through the IDEA's procedures was reasonably calculated to enable the child to receive educational benefits.  Rowley, 458 U.S. at 206-207.  In the context of the instant case, where the parents of a disabled child have unilaterally placed the child in a private school, reimbursement is appropriate when a school district has failed "to provide a FAPE and a child's private-school placement is appropriate, without regard to the child's prior receipt of services."  Forest Grove School Dist. 129 S.Ct. at 2494.  A reviewing court must examine the record for any objective evidence indicating whether the student was "likely to make progress" under the school board's proposed plan.  Walczak, 142 F.3d at 130.  Here, the objective evidence supports the hearing officer's finding that District No. 9 failed to fulfill its Child Find obligations and to provide M.M. a FAPE.

20

District No. 9 complains that the hearing officer erred by finding that it had committed "gross procedural violations" through its failure to refer M.M. to a PPT in a timely manner based upon the information that the parents had provided on or before August 22, 2006.  District No. 9 points out that M.M.'s mother failed to disclose fully to the Joel Barlow staff M.M.'s history and emotional state.  Specifically, it is undisputed that on August 22, M.M.'s mother provided no information concerning M.M.'s first suicide attempt or the reason why she had been admitted to Silver Hill.

In order to establish a procedural violation of the Child Find obligation, the school officials must have "overlooked clear signs of disability," be "negligent in failing to order testing," or have "no rational justification for not deciding to evaluate." Bd. of Educ. v. L.M., 478 F.3d 387, 313 (6th Cir. 2007); A.P. v. Woodstock Bd. of Educ., 572 F. Supp. 2d 221, 225 (D. Conn. 2008).  M.M.'s inability to commence classes due to admission to a psychiatric hospital constitutes a "clear sign of a disability" overlooked by Joel Barlow staff, although the Court recognizes that the information reflected in the health assessment form and knowledge of M.M.'s prescriptions for antidepressants would not without more have been sufficient to have raised such suspicion.

District No. 9 argues that the fact that M.M. was admitted to a psychiatric hospital does not necessarily mean that she would qualify for special education.  However, the standard for triggering the Child Find duty is suspicion of a disability rather than factual knowledge of a qualifying disability.

District No. 9 maintains further that in order to suspect that M.M. had a disability of emotional disturbance, it would have had to suspect that the student was exhibiting certain characteristics of emotional disturbance "over a long period of time."   District

No. 9 advances this argument in reliance upon the regulations' definition of emotional

disturbance as:

> a condition exhibiting one or more of the following characteristics over a long
> period of time and to a marked degree that adversely affects a child's
> educational performance: (A) An inability to learn that cannot be explained by
> intellectual, sensory, or health factors. (B) An inability to build or maintain
> satisfactory interpersonal relationships with peers and teachers. (C)
> Inappropriate types of behavior or feelings under normal circumstances.  (D) A
> general pervasive mood of unhappiness or depression. (E) A tendency to
> develop physical symptoms or fears associated with personal or school
> problems.

34 C.F.R. § 300.8(c)(4)(i).  However, the law does not require District No. 9 to have

observed M.M. over a long period of time to have gained a suspicion that she might

have been suffering from an emotional disturbance for a "long period of time".  Here,

District No. 9 had been informed of M.M.'s prior diagnosis of depression, her use of

medication, and her psychiatric hospitalization that prevented her from commencing

classes at Joel Barlow.  This information is sufficient to raise a suspicion that M.M. may

have suffered from an emotional disturbance over a long period of time.

Thus, District No. 9 should have evaluated M.M. within a reasonable amount of

time after it had notice on August 22, 2006 that M.M.'s psychiatric state interfered with

her ability to engage in academics at Joel Barlow.  Courts have found Child Find

violations where no evaluation occurred six-to-thirteen months after the school board

had notice of a suspected disability.  See  Richard R., 567 F. Supp. 2d at 952 (thirteen

months); Dept. of Educ., State of Hawai'i v. Cari Rae S., 158 F. Supp. 2d 1190,1195-97

(D. Haw. 2001) (six months).

District No. 9 contends that the hearing officer unreasonably held that it should have conducted an evaluation within the three days between the mother's August 22 conversation and M.M.'s placement in Utah.  District No. 9's argument is dependent upon its position, which this Court has already rejected, that its obligations to M.M. were divested as soon as her parents placed her at the program in Utah.  As the record bears out, even after District No. 9 had knowledge of M.M.'s suicide attempts and requirement for psychiatric treatment, it failed to provide the parents with their special education procedural safeguards, and the parents remained unaware of special education processes for evaluation, referral and program development.  No evaluation was conducted and a PPT meeting was not convened until February 8, 2007, after the defendant Parents through counsel requested one.

District No. 9 complains that it could not develop an IEP based on the evaluation of M.M. provided by the defendant Parents, and that, after the PPT in February 2007, the Parents had curtailed its ability to evaluate M.M. only in Utah.  District No. 9 contends further that the hearing officer appeared to have erroneously applied a mental harm exception based on 34 C.F.R. 300.148(e) to the school district's right to evaluate M.M.

It is well established that a school district may insist on having an evaluation conducted by qualified professionals who are satisfactory to the school officials.  Dubois v. Connecticut State Bd. of Educ., 727 F.2d 44, 49 (2d Cir. 1984); see also P.S. v. Brookfield Bd. of Educ., 353 F. Supp. 2d 306, 313 (D. Conn. 2005).  IDEA provides an exception to the parents' obligation to give notice of intent to remove the student from public school in instances of physical or serious emotional harm.  20 U.S.C. §

23

1412(a)(10)(C)(iv)(II); 34 C.F.R. §300.148.  However, it remains an open question whether concern for physical or serious emotional harm should also excuse parents from making the student available for an evaluation at the request of a school board.

The Court need not determine whether a mental health exception applies to excuse the Parents from making M.M. available.  Here, the hearing officer found that M.M. was "medically unstable" and that District No. 9 had not called into question the professional credentials of evaluators selected by the parents.  The hearing officer's decision reflects her equitable consideration of the circumstances rendered after District No.'s dereliction of its Child Find duties and failure to inform defendant Parents of their procedural safeguards, which conduct resulted in the loss of an educational opportunity.

District No. 9's disregard of its Child Find obligations constituted a gross procedural violation that resulted ultimately in the inability to provide M.M. a FAPE.[8] See N.G., 556 F. Supp. 2d at 37; Abramson, 493 F. Supp. 2d at 86.  Prior to the February PPT, District No. 9 had failed to move forward with its Child Find obligations during an almost six-month period after notice of M.M.'s potential disability.  M.M.'s later "unavailablity" after the February PPT should not excuse District No. 9 of its IDEA obligations to M.M., when its conduct impeded the ability to work with defendant Parents to secure an evaluation of M.M. within a reasonable time and to develop an

---

[8] Regardless of whether the Court applies a de novo or due deference standard, the Court agrees that District No. 9's failure to satisfy its IDEA obligations resulted in the loss of an opportunity to provide a FAPE.

IEP reasonably calculated to provide her with a FAPE.[9]  Cari Rae S., 158 F. Supp. 2d at

1195-97.  Had District No. 9 satisfied its Child Find mandate as of August 22, 2006, the

parents could have made M.M. available for evaluation without requiring her to travel

from Utah to Connecticut.  As District No. 9 points out, approximately three months prior

to the February 8, 2007 PPT meeting, M.M. attended for one month John Dewey

Academy in Massachusetts, which is only 74 miles away from Joel Barlow.

       The Court affirms the hearing officer's findings that M.M. was eligible for special

education under the category of emotional disturbance based on the

information and reports submitted by the parents and professional opinion from Dr.

Marotta.   IDEA mandates that, in evaluating the student, the IEP shall, as appropriate,

"review existing evaluation data, including – – (i) evaluations and information provided

by the parents of the child; (ii) current classroom-based, local, or State assessments,

and classroom-based observations, and observations by teachers and other providers."

20 U.S.C. § 1414(c)(1).  The LEA "shall" use a "variety of assessment tools and

strategies to gather relevant functional, developmental, and academic information,

including information provided by the parent, that may assist in determining" a disability.

20 U.S.C. § 1414(b)(2)(A).  The statute does not impose "a single measure or

assessment as the sole criterion for determining whether a child is a child with a

disability or determining an appropriate educational program for the child."  20 U.S.C. §

1414(b)(2)(B).

---

     [9]The Child Find requirement is an affirmative obligation and a parent is not required to request that a school district identify and evaluate a child.  E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist., 2008 WL 4615436 (N.D. Cal. 2008).

As the hearing officer observed, District No. 9 did not contest the "professional psychiatric opinion as to the Student's emotional disturbance" but sought further information as to whether M.M. also suffered from "a non-verbal learning disability" and an opportunity for classroom observation.  Further professional evaluation and classroom observation would have enhanced District No. 9's capacity to provide an IEP but it was not required to determine eligibility in light of the competent evidence adduced at the IEP as to M.M.'s emotional disturbance.  As of August 22, 2006, District No. 9 had an obligation to determine M.M.'s eligibility under the emotional disturbance category and to develop an IEP.  It failed to do so.

The record also supports the hearing officer's conclusion that M.M.'s private school placement at Second Nature and Vista at Dimple Dell was appropriate.  Upon denial of a FAPE by the LEA, an alternative private placement should be reasonably calculated to enable the child to receive education benefits, but it need not necessarily meet the standards of IDEA's FAPE requirement.  Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, 364 (2d Cir. 2006), cert. denied, 128 S.Ct. 436 (2007); see also Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999) ("the test for the parents' private placement is that it is appropriate, and not that it is perfect").  The authority to grant reimbursement is discretionary, and therefore, "equitable considerations" relative to the reasonableness of the parents' action are relevant in fashioning relief.  Frank G., 459 F.3d at 364.  Nevertheless, the Court should consider the same criteria applied in determining whether the LEA placement is appropriate and assess the record for objective evidence indicative of whether the student was likely to make progress or regress in the placement.  Gagliardo v. Arlington Central Sch. Dist.,

26

489 F.3d 105, 113 (2d Cir. 2007).  Courts should consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs.  Frank G., 459 F.3d at 364.

Here, the hearing officer noted that both Second Nature and Vista were private accredited therapeutic placements approved by the appropriate state licensing agencies, and that the testimony presented at the due process hearing regarding the appropriateness of the programs, how they met M.M.'s needs and M.M.'s progress "was essentially unchallenged."

On summary judgment, District No. 9 argues that tuition reimbursement is only available for children who have previously received special education while in the public school and that such remedy is the responsibility of Utah due to the defendant Parents' unilateral placement of M.M. in Utah.  The Supreme Court has rejected District No. 9's first argument, Forest Grove Sch. Dist. v. T.A., 129 S.Ct. 2484 (2009), and this Court has previously above disposed of District No. 9's second argument.   Accordingly, the Court affirms the hearing officer's award of reimbursement.

District No. 9 challenges the hearing officer's award of compensatory education. which is "prospective equitable relief" that requires a school district to fund education "as a remedy for any earlier deprivations in the child's education."  Somoza v. New York City Dept. of Educ., 538 F.3d 106, 109 n. 2 (2d Cir. 2008).  District No. 9 recognizes that the compensatory education award is "totally derivative of and dependent upon the resolution" of the issues previously determined in this ruling.  Consistent with this Court's prior discussion above, the Court will affirm the award of compensatory education based on District No. 9's procedural violations of IDEA.

27

**Conclusion**

For the foregoing reasons, District No. 9's motion for summary judgment [# 47] is DENIED; and Mr. and Mrs. M.'s motion for summary judgment [#44] is GRANTED.  The Court hereby affirms the hearing officer's decision.  The clerk is instructed to enter judgment in favor of Mr. and Mrs. M. and to close this case.


Dated at Bridgeport, Connecticut, this __6th__ day of August, 2009.


_____/s/_____
Warren W. Eginton
Senior United States District Judge